UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 JUL -9 AM II: 37

CLERK

BY_____

DEPUTY CLERK

STEVEN J. ANDERSEN,
        Plaintiff,

VS.                                                   CASE NO.: 2:21-cv-183

HILTON FRANCHISE HOLDING LLC,
        Defendants.

**REGISTERED AGENT:**
CORPORATION SERVICE COMPANY
251 LITTLE FALLS DR.
WILMINGTON, DE. 19808.
        **SERVE BY:**

HILTON WORLDWIDE HOLDING, INC.,

**REGISTERED AGENT:**
CORPORATION SERVICE COMPANY
100 SHOCKOE SLIP F1 2
RICHMOND, VA. 23219-4100.
        **SERVE BY:**

HOSPITALITY COVER PLUS LLC,

**REGISTERED AGENT:**
ROBERT F. BRUNS
2 HAMILL RD., STE. 155
BALTIMORE, MD 21210.
        **SERVE BY:**

HILTON DOMESTIC OPERATING COMPANY, INC.,

**REGISTERED AGENT:**
CORPORATION SERVICE COMPANY
421 WEST MAIN ST.
FRANKFORT, KY 40601
        **SERVE BY:**

1378 PUTNEY LLC

**REGISTERED AGENT:**
CORPORATION SERVICE COMPANY
100 N. MAIN ST., STE. 2

BARRE, VT 05641
**SERVE BY:**

## COMPLAINT

Comes the Plaintiff, Steven J. Andersen, (hereinafter "Plaintiff" or "Andersen"), by counsel, and for his Complaint against Defendants Hilton Franchise Holdings, LLC, Hilton Worldwide Holding, Inc, Hospitality Cover Plus LLC, Hilton Domestic Operating Company, Inc., and 1378 Putney LLC.; and states as follows:

## PARTIES

1.  Plaintiff Steven J. Andersen (herein known as "Plaintiff" or "Andersen") is a resident of Georgetown, Kentucky with a residence at 107 Shinnecock Hill Drive, Georgetown, Kentucky, 40324.

2.  Defendant, Hilton Franchise Holding LLC (hereinafter known as "Defendant Franchisor"), has a principal office at 7930 Jones Branch Drive, McLean, Virginia 22102-3388. Its registered agent for service is the Corporation Service Company located at 251 Little Falls Drive, Wilmington, Delaware 19808.

3.  Defendant, Hilton Worldwide Holdings Inc. (herein known as "Hilton Worldwide), has a principal office at 1775 Tysons Blvd., Fl 7, Mc Lean, Virginia 22102 – 4285. Its registered agent for service is the Corporation Service Company located at 100 Shockoe Slip Fl 2, Richmond, Virginia 23219 – 4100. It is the Parent company to numerous subsidiaries.

4.  Defendant, Hospitality Cover Plus LLC has a principal office at 2 Hamill Road, Suite 2, Baltimore, Maryland 20210. Its Registered agent for service is Robert F. Bruns at the same address.

5.  Defendant, 1378 Putney LLC (herein known as "Defendant Hampton or Hampton"), has a principal office and place of business at 100 Century Parkway #110, Mount Laurel, New Jersey

08054. Its registered agent for service is the Corporation Service Company located at 100 North Main Street, Suite 2, Barre, Vermont 05641.

6. Defendant, Hilton Domestic Operating Company Inc., (herein known as "Hilton"), has a principal office at 7930 Jones Branch Drive, McLean, Virginia 22102-3388. Its register agent for service is the Corporation Service Company with a Kentucky office located at 421 West Main Street, Frankfort, Kentucky 40601.

7. Any reference to "Hilton Defendants" is a generalized reference made when either multiple Hilton subsidies or the Parent are involved, or it is unknown which Hilton Defendant(s) are involved.

FACTUAL BACKGROUND

The Website, Business Transaction, First Transmission of Data

8. On July 7th, 2020, Plaintiff Andersen reserved a room using his credit card online at the Brattleboro Hampton Inn website with an arrival date of July 14, 2020, and a departure date of July 17, 2020. This Hampton is owned and Operated by Defendant Hampton.

9. Upon finalizing the reservation, the Plaintiff had to electronically agree to a user agreement that stated, "this is a binding legal agreement." That binding legal agreement gave Hilton Defendants the right to charge Plaintiff's credit card in the event of an untimely cancellation.

10. This agreement or contract was entered into while Andersen was in his office located in Kentucky.

11. The services to be provided to Andersen were to be provided in Vermont, and consisted of lodging and other related services.

12. Upon finalization of this business transaction personal data was transmitted from Georgetown, Kentucky to the Hilton Reservation Office, from there it was put onto the Hilton's network and then transmitted to Defendant Hampton.[1]

13. Andersen also agreed to a data protection clause when he entered the contract for the Hampton reservation.[2]

14. The data protection clause states that Hilton takes "reasonable measures to protect data from unauthorized access, disclosure, altercation, or destruction", and that Hilton requires "third parties with whom we share personal data to exercise reasonable efforts to maintain the confidentiality of personal data."

15. The website that the Plaintiff used to book his room bore the heading and name "Hampton Inn Brattleboro". When the home button of the site is pressed the user is brought back to the Brattleboro Hampton page and not the Hilton's website. The page is exclusively the Defendant Hampton's webpage while at the same time being connected to the main Hilton website.

16. Defendant Hampton pays Defendant Hiltons for the privilege of using the website space. Hilton and Defendant Franchisor also agree to maintain the website in return for fees and royalties.

17. As a part of the Franchise agreement Defendant Hampton pays the other Hilton Defendants to advertise the Hampton brand in Kentucky.

### The Incident at the Hampton

18. Andersen had booked a Studio Suite with a sleeper sofa for reasons relating to physical infirmities. Before arriving, he discovered that the Defendant Hampton had changed his booking

---

[1] All Hilton Franchisees must purchase Hilton Business Computers and Hilton Worldwide Holdings Inc. proprietary software which connects to the Hilton Reservation office. See Hilton Franchise Holdings LLC, Franchise Disclosure Document, Hilton Worldwide, U.S. Hampton, p. 36-37 (2020) accessed at
https://www.franchisedirect.com/fdd/pdf/00000178-33ed-d644-a1ff-37ff20ca0000
[2] See Hampton Defendant's website at https://www.hilton.com/en/hotels/bravthx-hampton-brattleboro/

to a room without a sleeper sofa. He complained to one of Hilton's agents who called ahead and fixed his accommodation.

19. Once in his room Andersen realized that the television remote controller did not work. He called for batteries and was told that he would have to come to the front desk. At the front desk he was given a different remote.

20. The second remote did not work either. Upon returning to the desk Andersen was told that he would be set up in a new room which did not contain a sleeper sofa. A room that did not meet the specifications of the booking that he had contracted for in Kentucky.

21. Andersen asked if he might have the original remote back instead of changing to a room without a sleeper sofa. The front desk clerk denied his request. A reasonable request since he had contracted for that specific room specification and did so because of physical infirmities.

22. This is when Andersen was asked to leave the property for "copping an attitude." The Plaintiff gathered his things and left the property.

The Second Transmission of Personal Data

23. From his office located in Kentucky Andersen sent a polite email the CEO and President of the Hilton Christopher Nassetta complaining of his treatment at Hampton owned by Defendant.

24. In that email Andersen declares his loyal support of the Hilton Company, and describes how the Brattleboro Hampton is well below the Hilton standard he has come to rely upon. The Defendant Hampton is known for its unsavory reputation in the Brattleboro community, and it is well known for its poor management.

25. At the bottom of the email sent to the CEO is a confidentiality statement which says "this email and any files transmitted with it are confidential and intended solely for the use of the individual or the entity to whom they are addressed."

26. In response to the email sent to the CEO, Hilton Executive Ambassador in charge of Hilton public relations, Quitta Johnson called Andersen in Kentucky.

27. On July 19th, 2020, Quitta Johnson sent Andersen, who was in Kentucky, an email to follow up on their phone conversation. That email is related to the complaint against Defendant Hampton.

28. In that email she told Andersen that an official complaint file had been created and an investigation would be undertaken.

29. On July 21st, 2020, Andersen responded to the Hilton Ambassador's email from his Kentucky office. That email bore the same confidentiality statement referenced in paragraph 25.

30. Unsatisfied with the Hilton's lack of action, Andersen filed a formal complaint with the Vermont Office of the Attorney General accusing Defendant Hampton of practicing a "bait and switch".

### The Multiple Data breaches and the Retaliation targeted at the Commonwealth

31. The manager of Defendant Hampton at the time of the incident is Jolene Belair.

32. The Hilton Ambassador gave manager Jolene Belair notice of Andersen's complaint.

33. The Hilton then provided, without authority from Andersen, Andersen's two private email correspondences (See para.24-29) to Defendant Hampton and its manager.

34. The emails correspondence given to Defendant Hampton's manager bore Andersen's confidentiality statement (See para. 25).

35. That confidentiality statement clearly states that those emails are confidential and were only to be viewed by the Hilton Ambassador or Hilton organization.

36. The private emails were explicitly not meant to be seen by the Hampton or its agents. This act was a clear violation of Andersen's privacy rights.

37. In response to the complaint, the Manager launched a series of attacks aimed at the Andersen.

38. The Manager the used Facebook as a forum for a series of defamatory statements directed at the Andersen with the intent of ruining his reputation.

39. In a series of Facebook posts Jolene Belair calls the Andersen "biased", "racist", and a "jackass".

40. The Facebook posts disclose private details of the Hilton's investigation into the Andersen's complaint.

41. A Reservation History document containing the Andersen's private data is posted to the Facebook by Manager.

42. At the bottom the reservation document is the word "confidential."

43. The Reservation History was downloaded from the Defendant Hampton's Hilton Computer using the Hilton Reservation software that was purchased from Hilton Worldwide (See footnote 1).

44. Jolene Belair then posted the two private emails sent to the Hilton CEO and its Executive Ambassador (See para.32-29).

45. Those emails had been sent from Kentucky and bore Andersen's confidentiality statement.

46. The manager posted a copy of the Andersen's complaint to the Attorney General (See para. 30). That document included the Andersen's name, cell phone number, and address.

47. There were two separate post of the Attorney General document. One that redacted the Andersen's number and address, and one that did not redact his name and address.

48. The last document manager posted was a copy of an email correspondence to the Hilton Ambassador, discussing the investigation and Andersen (herein known as the "Investigation Email").

49. She calls the Andersen a "Jackass" and "Racist" in the investigation email.

50. In addition, the manager makes the "false" and "defamatory" accusation that the Andersen chose to file a complaint with the Attorney General because the Hilton Ambassador is a black woman, and since she is a black woman he has no faith in her ability to conduct a proper investigation.

51. In the Investigation Email with the Hilton Ambassador manager Jolene Belair outlines her plans to attack and retaliate against the Andersen.

52. At the end of the Investigation Email she says verbatim: "MY team we move as ONE......So, when he attacked Keesha[3], he attacked EVERY last one of us here at the Hampton by Hilton of Brattleboro."

53. In the Investigation Email the manager tells the Hilton Ambassador that she has a "packet of communications and actions of individuals involved", and that she has attached the packet to the email.

54. The packet that the manager is referring to holds the Andersen's private data, data that the Hilton was only supposed to be privy too.

55. Hilton failed to stop Manager from acting.

56. In the Facebook post, corresponding to the Investigation Email manager Jolene Belair says verbatim: "This is my letter regarding our team members and guest...u attack one u attack us all. WE ARE IN THIS TOGETHER# blm".

---

[3] Keesha is the front desk clerk at the time of the incident resulting in Plaintiff's expulsion. This statement is proof that Jolene Belair did not even personally witness the incident.

57. Andersen soon became aware of the Facebook post in Georgetown, Ky. when a Good Samaritan contacted him and told him what had happened.

58. The Facebook were viewable by anyone in the world.

59. The private data contained in the Facebook post can never be deleted by Andersen.

## The Harassing Text Message, and Fearful Response

60. That same day someone sent a text to Andersen calling him a "racist piece of shit."

61. Andersen was fearful upon receiving the text and did not what else would happen.

62. Andersen is originally from the Brattleboro, Vermont, area and has family and business contacts in that area.

63. Andersen reasonably believes that family and business associates saw the postings of his private and confidential information as well as the false and defamatory comments.

64. Andersen is aware through an internet search that the Manager has had gang affiliations in the past due to a local news article from 2014 in the Brattleboro Reformer. The Manager had been a character witness in the kidnapping trial for her then boyfriend, Salahdin Trowell, a known member of the infamous Bloods gang. The article was titled "State request up to 35 years in Brattleboro kidnap case."

65. The harassing text message, the Manager's violent declarations of war (See para. 51 and 54), and the Manager's known gang associations have caused significant emotional distress to Andersen, made him fear for his life, and was an invasion of his privacy.

## Hospitality Cover Plus LLC

66. Hospitality Cover Plus provided insurance and risk management services for the Brattleboro Hampton Inn. owned by Defendant Hampton at the time of the incident.

67. The Brattleboro Hampton Inn owned by Defendant has a terrible reputation in the Community and is known for its mismanagement.

68. That Hampton was managed by an individual with known Gang ties.

69. Hospitality Cover Plus LLC should have known that Defendant Hampton posed a great risk to its patrons.

### JURISDICTION, VENUE, AND CHOICE OF LAW

70. The Plaintiff restates and re-alleges, and incorporates herein by reference, the proceeding paragraphs as if fully set forth herein.

71. The Vermont District Court has subject matter jurisdiction under 28 U.S.C. 1332. The Plaintiff is a citizen of Kentucky and none of the Defendants are citizens of Kentucky for the purposes of jurisdiction, therefore, the parties are completely diverse. Further, the amount in controversy exceeds $75,000.

72. When a federal court sits in diversity, it may exercise personal jurisdiction over an out-of-state defendant only if a court of the forum state could do so. The Vermont Longarm Statute reaches the full extent of Due Process.

### Due Process

73. The oft-utilized three-part test for accessing the constitutionality of specific jurisdiction requires:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough

connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

74. The Defendants Purposely availed themselves of the privilege of acting within the State of Vermont as this is where all the events leading to this cause of action occurred.

75. All the claims arise from the loss of private personal data received and released in the State of Vermont due to the lack care of Defendants and the invasion of Andersen's privacy.

76. The acts, omissions, and consequences caused by Defendants have a substantial connection to the forum state since they either arose from the data transmitted from the forum or the torts perpetrated in forum, or the injuries caused by actions from within the forum state.

77. For these reasons specific jurisdiction over the Defendants is appropriate.

78. General jurisdiction is appropriate because the Defendants have such continuous and systematic contacts with the forum state by virtue of their significant business connections within the State of Vermont.

## Choice of Law and Venue

79. The standard for applying Vermont law is whether Vermont had enough contacts to justify applying Vermont law. The Defendant Hotel had more than ample contacts with the forum state through their manager's actions. Therefore, Vermont law should govern.

80. Venue is proper under 28 U.S.C. 1391(b)(2) because a substantial part of the events leading to these claims took place in the District of Vermont.

## COUNT I
## DEFAMATION

81. Andersen herby incorporates the allegations set forth in paragraphs 1-80 as if fully set forth herein.

82. Defamation is characterized as making false and defamatory statements about a plaintiff which is published and causes injury to the plaintiff's reputation. The statement made by the Manager were false and defamatory. That as a direct and proximate result of the defamatory statements made by the Defendant Hampton's Manager, Andersen has suffered: a) Injury to their reputation in the community; b) Mental anguish and injury to their feelings; c) Losses and injuries reasonably certain to be sustained in the future. That the defamatory statement made by the Defendant Hampton, through its Manager, were intentional, and with malice, thus Andersen is entitled to punitive damages.

83. Defendant Hampton's Manager intentionally made a false and defamatory statements described in paragraphs 37-59.

84. As a direct and proximate cause of the defamatory statements, Andersen suffered injury to his reputation in his community at home in Scott County, in Vermont where he is from and family resides, and in various parts of the county where he does business.

85. The Plaintiff has suffered mental anguish because of the injuries to his reputation and business.

86. It is reasonably certain that Plaintiff Andersen has and will continue to sustain real injuries given the permeant nature of the internet.

87. Therefore, Defendants are liable for defamation per se and have caused Andersen to suffer real and actual damages for an amount to be determined at trial.

COUNT II
LIBEL

88. Andersen hereby incorporates the allegations set forth in paragraph 1-87 as if fully set forth herein.

89. Libel is characterized as false defamatory publication by the Defendant about the Plaintiff which caused injury to the Plaintiff's reputation.

90. Defendant Hampton's Manager published a false defamatory statement about Andersen by falsely accusing him of being a racist online.

91. As a result, Andersen suffered injury to his reputation set forth in herein.

92. Therefore, Defendants are liable for Libel and have caused Andersen real and actual damages for an amount to be determined at trial.

COUNT III
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

93. Andersen hereby incorporates the allegations set forth in paragraphs 1-92 as if fully set forth herein.

94. Intentional Infliction of Emotional Distress is characterized by one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress.

95. The actions of Defendant Hampton and its Manager were extreme and outrageous because the use of Andersen's personal data and the defamation that followed were done explicitly done with the intent of causing harm. Such an orchestrated attack on a customer by a Manager is on its face an outrageous act that offends against the generally accepted standards of decency and morality.

96. The Defendant Hampton manager used extreme and militant language that she was going to get revenge on the Plaintiff (See para. 52 and 56). This language would strike fear into the heart of any person.

97. The acts of Defendant Hampton's Manager were intentional and motivated by malice. There is no other explanation for the Manager's actions.

98. Andersen fears that his family might be harmed because of the Manager's gang affiliations. Andersen fears that the incident may have caused irreparable harm to his business reputation and standing in the community. As a result, he suffered severe emotional distress as a result of Defendant Hampton's acts and omissions. And the acts and omissions of the Manager.

99. Therefore, Defendant Hampton is liable for Intentional Infliction of Emotional Distress and have caused Andersen real and actual damages for an amount to be determined at trial.

COUNT IV
INVASION OF PRIVACY

100.      Andersen hereby incorporates the allegations set forth in paragraphs 1-99 as if fully set forth herein.

101.      Invasion of Privacy is based on the right of a person to be free from unwarranted publicity, or the right to live without unwarranted inference by the public about matters with which the public is not necessarily concerned. There are four categories of invasion of privacy but only two categories apply to the defendant which are "unreasonable publicity given to another's private life" and "false light invasion of privacy". One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of privacy, if the matter publicized is of a kind that (1) would be highly offensive to a reasonable person, and (2) not of legitimate concern to the public. A plaintiff is subject to "false light" invasion of privacy when: (1) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and (2) the publisher had knowledge of, or acted in reckless disregard of the falsity of the publicized matter and the false light in which the other was placed.

102.      Defendant Hampton's Manager gave publicity to a matter concerning Andersen's personal life by falsely accusing him of being racist and posting his personal data online; this

would be highly offensive to a reasonable person; and the posting of his personal data is of no of public concern.

103.    Andersen was placed in a "false light" through the Manager's "knowingly false and reckless" publication of racist allegations that would have been highly offensive to a reasonable person.

104.    Defendant Hilton's Executive Ambassador leaked a private email correspondence to manager Jolene Belair. This leaked email had a confidentiality statement attached to it and was not meant to be released. This leak falls into another category of invasion of privacy, "unreasonable publicity given to one's private life." The Hilton should have never given that complaint email to the Jolene Belair especially since it pertained to her actions.

105.    The posting of Andersen's personal data on Facebook (See para. 37-59) is an invasion of Plaintiff's Privacy.

106.    Defendants entrusted Manger with personal data about Andersen and did not properly train her not to release it to the public.

107.    As a result, Andersen has suffered direct injury from both categories of invasion of privacy and will continue to suffer harm.

108.    Therefore, Defendants are liable for invasion of privacy and have caused real and actual damages for an amount to be determined at trial.

## COUNT V
## NEGLIGENT HIRING, TRAINING, RETENTION, AND SUPERVISION

109.    Andersen hereby incorporates the allegations set forth in paragraphs 1-108 as if fully set forth herein.

110.    Defendant Hampton and Hilton negligently hired, retained, trained and supervised its Manager. Defendant Hilton negligently trained their Executive Ambassador. A claim for

failure to properly supervise the manager created an unreasonable risk to customers. Therefore, the Defendant Hampton was negligent in its supervision of the manager.

114.    The conduct of the Manager gives rise to a strong presumption that the Hilton failed to properly train her. The actions of the Manager were so outrageous that no one could assume she was acting under the confines of proper training. Therefore, Defendant Hampton negligently trained their manager.

115.    Defendant Hilton negligently trained, hired, and retained its Executive Ambassador. The Plaintiff had emailed the Executive Ambassador complaining of his treatment by Defendant Hampton's manager. The Executive Ambassador of the Hilton then leaked that email to the manager Jolene Belair who was the subject of that complaint. At the bottom of that email Plaintiff had a confidentiality statement to protect his privacy. No reasonable employee would give a private complaint and correspondence to the person whom the complaint is about. This creates a presumption that the Executive Ambassador was negligently trained, hired, and retained by the Hilton.

116.    As a result of Defendants negligence Andersen suffered injuries stated herein.

117.    Therefore, Defendants negligently hired, retained, supervised, and trained their Manager and Executive Ambassador, and should be liable for some or all causes of actions related to this negligence. Defendants have caused real and actual damages to be determined at trial.

## COUNT VI
## NEGLIGENCE

118.    Andersen hereby incorporates the allegations set forth in paragraphs 1-117 as if fully set forth herein.

negligent hiring arises when an employer negligently places a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which it should have been foreseeable that the individual posed a threat of injury to others. Negligent retention requires that the employer be aware, or should have been aware, that an employee poses a threat and; fails to take remedies measures to ensure the safety of others. Negligent supervision requires that the employer knew or should have known that the manager was unfit for the job, and the employer's alleged failure to properly supervise the managers created an unreasonable risk of harm to the claimant. Lastly, negligent training occurs when an employer fails to provide sufficient training to a manager to perform their job safely. This may occur if the supervisor fails or trainer fails to follow proper training procedure.

111.    Defendant Hampton should have known following reasonable investigation that Manager had known propensities for illegal or outrageous behavior before hiring her. It is public knowledge that the Manager has past associations with the gang known as the "Bloods." It was more than foreseeable that injury might occur to a guest, therefore, Defendant Hampton was negligent in its hiring of the Manager.

112.    Over the course of the tortfeasor's employment, Defendants should have been aware that the Manager posed a risk to customers. Rarely do such actions as the ones that the Manager engaged in happen in isolation. Despite the Manager's unsavory reputation in the community the Defendant Hampton failed to take remedial action, therefore, the Manager was negligently retained.

113.    Defendant Hampton's management should have known that Manager lacked fitness for the job given her background, associations, and reputation in the community. The Defendant's

119.     Negligence is characterized as a breach of a duty that directly and proximately causes injury to the plaintiff. Defendants were negligent in their protection of Plaintiff Andersen's personal data.

120.     Defendants had a duty to protect the personal data of Andersen described in paragraph 12 and paragraphs 23-29. That Duty was created because of the data protection (See para. 13-14), and the confidentiality statement described in paragraph 25.

121.     That duty was breached when Manager posted sensitive personal data from the Hilton Reservation System and disclosed the private email correspondence with the Hilton executive and CEO (See para. 37-59).

122.     But-for the Defendants failure to protect Andersen's data, none of the injuries set forth herein would have occurred; without plaintiff's personal data the Manager would not have known plaintiff's name nor would she have been able to direct people to harass plaintiff.

123.     Defendant's breach of duty to protect Andersen's private data proximately caused Plaintiff to lose his data along with other injuries already alleged. The injury was directly caused by this breach of duty.

124.     As a result of Defendant's negligence Andersen lost his personal data, and all other injuries described in paragraphs 1-123 stem from that breach of duty.

125.     Therefore, Defendants are liable for negligence in failing to secure Andersen's personal data and have caused plaintiff real and actual damages to be determined at trial.

## COUNT VII
## BREACH OF CONTRACT

126.     Andersen hereby incorporates the allegations set forth in paragraphs 1-125 as if fully set forth herein.

127.     Andersen entered a contract with the Defendants when he reserved his room at Defendant Hampton's hotel in Vermont (See para. 8-14).

128.     That contract required the acceptance of a data protection clause (See para. 14).

129.     The Defendant breached the contract when they allowed the unauthorized release of Plaintiff Andersen's Reservation Data (See. Paras. 38 - 57).

130.     Andersen has been injured as a direct and proximate result of the breach.

COUNT VIII
BREACH OF IMPLIED CONTRACT

131.     Andersen hereby incorporate the allegations set forth in paragraphs 1-130 as fully set forth herein.

132.     Andersen's confidentiality statement attached to his email described in (See para. 25) created an implied contract that the contents of the email would not be disclosed to anyone other than the Hilton or its Ambassador.

133.     The Defendants breached this implied contract when they released the emails to the Hampton manager Jolene Belair. And She further breached the implied contract by releasing the emails on Facebook.

134.     Andersen has been injured as a direct and proximate result of the breach.

COUNT IX
VICARIOUS LIABILITY, RESPONDEAT SUPERIOR
(1378 PUTNEY LLC, HILTON HOLDING LLC., HILTON WORLDWIDE HOLDINGS LLC, and HOSPITALITY COVER PLUS LLC)

135.     Plaintiff hereby incorporates the allegations set forth in paragraphs 1-134 as fully set forth herein.

136.     At all times relevant to this case, the Manager and Hilton Ambassador were acting (as either an actual agent or an apparent agent or an implied agent) on behalf of Defendants 1378

Putney LLC, Hilton Holding LLC, Hilton Domestic Operating Company Inc., Hilton Worldwide Holdings LLC, and Hospitality Cover Plus LLC.

137.     The Manager acted within her capacity and scope of employment as an agent of Defendant Hampton.

138.     As a direct and proximate result of the Manager negligence Defendant Hampton is liable for injuries sustained and damages outlined above in paragraphs 1-137.

139.     The Defendants mentioned above in paragraph 136 are liable to Andersen for all damages flowing from their conduct.

**WHEREFORE**, Plaintiff respectfully requests the following:

A.  A jury trial on all matters triable by jury as a matter of right;

B.  Compensatory damages as determined at trial;

C.  Incidental and consequential damages according to proof;

D.  Punitive damages according to proof;

E.  The Plaintiff's costs herein expended, including reasonable attorneys' fees and costs; and

F.  Any and all other relief to which the Plaintiff may be entitled.

Date: _____

Respectfully submitted,

Andre F. Regard
Regard Law Group, PPLC
234 N Limestone
Lexington, KY 40507
Telephone: (859) 281-1318
Facsimile:  (859) 966-2373
aregard@regardlaw.com
*Co-Counsel for Plaintiff*

*Pro Hac Vice Pending*

Theodore C. Kramer
Kramer Law, P.C.
42 Park Place

Brattleboro, VT 05301
Telephone: (802) 257-2221
Facsimile:  (802) 257-2373
tck@kvpclaw.com
***Co-Counsel for Plaintiff***

## VERIFICATION

I, Steven J. Andersen, hereby affirm, subject to penalties for the crime of perjury, that the

foregoing statements are true and correct to the best of my knowledge, information, and belief.

*Steven J Andersen*

Steven J Andersen (Jul 2, 2021 15:51 EDT)

Steven J. Andersen

STATE OF KENTUCKY       )

                        ) SS:

COUNTY OF FAYETTE       )


Subscribed and sworn to before me by Steven J. Andersen on this 2ᵈ day of July
2021.

My Commission Expires: 4|4|2022

Ivey Workman
NOTARY PUBLIC
STATE AT LARGE
KENTUCKY
NOTARY ID# 598857
MY COMMISSION EXPIRES APRIL 4, 2022

Notary Public